UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 24-7 (JMB/DLM)

UNITED STATES OF AMERICA,

          Plaintiff,

    v.

DAVID V. ERICKSON,

          Defendant.

**UNITED STATES' TRIAL BRIEF**

The United States of America, by and through its attorneys Joseph H. Thompson, Acting United States Attorney for the District of Minnesota, and U.S. Department of Justice Tax Division Trial Attorneys Boris Bourget and Amanda R. Scott, respectfully submits the following Trial Brief. Included in this Trial Brief are a summary of the facts the Government expects the evidence will establish at trial and briefing regarding possible legal and evidentiary matters.[1]

---

[1] The facts and inferences provided in this Trial Brief are not intended to be a full description of the Government's evidence or arguments in this case. It is provided to (1) inform the Court as to the factual allegations against the Defendant; (2) facilitate the Court's consideration of motions in limine and arguments at the pre-trial conference; and (3) advise the Court as to the potential legal and factual issues during trial. In light of upcoming meetings with witnesses and defense filings, the Government respectfully reserves the right to supplement this trial brief or its motions in limine in advance of any pretrial conference, court hearing, or trial.

## OVERVIEW OF THE CHARGES & TRIAL

Defendant David V. Erickson is charged by Indictment with 16 counts:

1.    Counts 1–5: Tax Evasion, in violation of 26 U.S.C. § 7201;

2.    Counts 5–15: Aiding or Assisting in the Preparation of a False Tax Return, in violation of 26 U.S.C. § 7206(2); and

3.    Count 16: Making a False or Fraudulent Statement to a Federal Agency, in violation of 18 U.S.C. § 1001.

This case is set for a jury trial on August 11, 2025 in Courtroom 3B of the St. Paul courthouse. The Government expects that its case-in-chief will take approximately five days. The Government will be represented by Boris Bourget and Amanda R. Scott from the U.S. Department of Justice, Tax Division. The Defendant will be represented by William J. Mauzy and William Dooling from Mauzy Law Office, P.A.

## THE ANTICIPATED FACTS AT TRIAL

From at least 2014 through August 2019, the Defendant, an international tech entrepreneur and certified public accountant ("CPA"), evaded taxes on nearly $5 million by disguising that income as nontaxable loans. The Defendant brought this money into the United States from overseas companies he beneficially owned and controlled. To carry out his multi-year evasion scheme, he directed subordinates, who resided outside of the United States, to send him funds at his discretion; misled bookkeepers, accountants, and tax preparers about the nature of those funds as "loans" or "advances" on future, undeclared dividends; and filed false federal individual and corporate income tax returns, which grossly

underreported his income. As a result, the Defendant evaded over $1.5 million in federal income tax.

At its core, this case boils down to one bedrock fact: the millions of dollars in so-called loans that the Defendant claimed on his tax returns were not, in reality, true loans. No loan agreements were contemporaneously drawn up to memorialize the terms of repayment, and he did not make a single repayment during the years at issue. The Defendant used the money that he concealed from the Internal Revenue Service ("IRS") to furnish his lavish lifestyle, including the purchase of a $1.3 million home on Lake Minnetonka, a $175,000 Tesla, and an $78,000 wake boat.

### A.    The Defendant's Offshore Business Activity

The foreign companies controlled by the Defendant included Firefly Lane Ltd. and Firefly Lane Corporation N.V. (collectively, "Firefly"),[2] Surecom Corporation, Granity Entertainment DAC ("Granity"), and Rypl.com, Inc. ("Rypl") (collectively, the "Foreign Companies"). The Defendant held shares in Firefly and Rypl through Halstead Bay Holdings, Inc. ("HBH"), a Minnesota-based corporation that he wholly owned. There were two additional layers in the structure: a Dutch company called Ijshuis Corporation B.V. ("Ijshuis") (pronounced ICE-house), which HBH wholly owned, and a Curacao company,

---

[2] In August 2017, Firefly Lane Ltd., based in Anguilla, transferred its holdings to Firefly Corporation N.V., based in Curacao. Practically speaking, these companies are one in the same.

Bannister Corporation N.V. ("Bannister"), which, in turn, Ijshuis wholly owned.

Exhibit 1001, shown below, illustrates the relationship between these companies.



The Foreign Companies primarily earned revenue from the operation of Cam4.com, a website predominantly dedicated to the streaming of live, sexually explicit performances. Cam4.com generated revenue in three ways: (1) selling advertising space on the website; (2) charging membership fees that allowed users to access additional features on the website; and (3) selling virtual tokens that users could use to tip performers.

Cam4.com's revenues flowed through a complex web of entities and accounts. First, customers' payments to Cam.com were typically processed

through various foreign and domestic credit card processing companies, including SegPay, Epoch, and DialXS, for the benefit of the website's merchant: Granity. The credit card processing companies batched and settled those payments out to the Granity's bank accounts at fixed intervals, sometimes daily or weekly.

Over the years, Granity has held bank accounts in, among other countries, Bulgaria, Czech Republic, Germany, Ireland, Luxembourg, and the Netherlands. Granity's major expense from those accounts was compensation for individuals who streamed content over Cam4.com. Granity also made payments to Rypl, which primarily banked in Canada, and Surecom, which primarily banked in the Caribbean, pursuant to management and license agreements. Then, funds held in Surecom's bank accounts then were typically sent to bank accounts in the name of Firefly, which also were typically set up in the Caribbean.

From there, Firefly's primary source of withdrawals was to make various payments to its shareholders, including the Defendant. During at least 2012 and 2013, the Defendant received such payments in domestic accounts he controlled directly from Firefly. In later years, however, Rypl acted a middleman or facilitator of those payments, meaning that money for the Defendant would first be sent from Firefly, Granity, or other related companies to Rypl, which in turn would send the money to the Defendant in the United States.

## B.    Payments Received from the Foreign Companies

The Defendant was intimately involved in the day-to-day financial affairs of both Firefly and Rypl, acting as the companies' de facto CFO. As part of his role,

the Defendant had broad authority to direct the Foreign Companies' finances. In total, from 2014 through 2018, the Defendant caused the Foreign Companies to send HBH over $8.85 million. The funds came from various foreign bank accounts at Toronto Dominion Bank in the names of Rypl, Granity Entertainment Inc., and Granity Media Inc.[3] and were deposited into a Wells Fargo bank account in the name of HBH, which the Defendant opened and had sole signing authority over. The Defendant reported a portion of these deposits, reflecting regular consulting fees and reimbursements for business expenses, as income on his federal tax returns. He disguised the remainder as purported loans to conceal that income from the IRS.

The Defendant's control over the Foreign Companies' finances included determining the amount of regular consulting fees that HBH received from the Foreign Companies. From 2014 through 2018, HBH received approximately $2.18 million in total consulting fees from the Foreign Companies, which the Defendant reported on his tax returns for those years. His authority to direct the Foreign Companies' finances, however, extended farther than setting HBH's monthly consulting fees.

---

[3] Granity Entertainment Inc. was a Canadian company incorporated in March 2017 that later changed its name to Granity Media Inc. in March 2018. This was another operating company of Firefly like the similarly named Irish company, Granity Entertainment DAC, discussed throughout this Trial Brief.

No later than January 2014, the Defendant began sending requests for money above and beyond HBH's set consulting payments to Antonio "Tony" Severin ("Severin"), Rypl's Director of Finance, and Amanda Zimmerman ("Zimmerman"), Rypl's Assistant Controller. Typically, the Defendant directed Severin and Zimmerman to send funds in amounts of his choosing. These requests fell into four general categories: (1) monthly credit card payments, (2) state and federal tax payments, (3) monthly "dividend advances" to pay alimony, and (4) ad hoc "loan" or "advance" requests.

    1. <u>Monthly Credit Card Payments</u>

The Defendant regularly requested funds to pay the entire monthly balance on his American Express credit cards, which he used for personal and business expenses. For example, on January 21, 2015, the Defendant emailed Zimmerman and Severin requesting $158,460.78 to pay the balance on his credit card. Between on or about January 21, 2014, and December 20, 2018, the Defendant sent approximately 68 emailed requests to Severin and Zimmerman to pay his credit card balances. The amounts of these requests ranged from roughly $13,000 to $158,000—totaling over $4.57 million.

Unlike other Rypl or Firefly employees and shareholders, the Defendant did not use a company-provided card for business expenses. He charged business expenses to his personal credit cards and then unilaterally coded which transactions were personal and which were business related. The Defendant treated the amounts that he coded as business-related payments as income to

7

HBH, in addition its regular consulting fees, on its corporate tax returns. Payments for his personal expenses, however, were purportedly added to the Defendant's loan balance owed to the Foreign Companies.

2. State and Federal Tax Payments

The Defendant also regularly directed Zimmerman and Severin to send funds to cover his state and federal tax payments, including the (underreported) amounts of income tax he reported owing on his tax returns and HBH's quarterly payroll and employment taxes.[4] For example, on January 14, 2014, he instructed Zimmerman and Severin to "send [him] $57,549.10 as soon as you can" so that he could "pay [his] 2013 annual Payroll and Income Tax payments."

Between on or about January 14, 2014, and December 31, 2018, the Defendant sent approximately 27 emailed requests to Severin and Zimmerman seeking funds to pay his state and federal taxes. The amounts of these requests ranged from roughly $5,000 to $107,500—totaling over $781,000. These payments also were typically added to the Defendant's loan balance owed to the Foreign Companies.

3. Regular Alimony Payments

As mentioned above, the Defendant dictated the amount of monthly consulting payments HBH received from the Foreign Companies. Between at least

---

[4] The Defendant was HBH's sole employee. Between 2014 and 2018, he paid himself a reported salary of approximately $137,500 per year.

January 2014 and April 2017, HBH's regular consulting income was roughly $36,200. In May 2017, the Defendant sent an email instructing Zimmerman and Severin to increase that recurring monthly payment to about $58,650, which HBH received thereafter and continuing through at least December 2018. Of that amount, about $38,650 reflected HBH's typical recurring consulting payment. The Defendant instructed Zimmerman and Severin to code the remaining $20,000 per month as a "dividend advance."

The Defendant adjusted HBH's recurring payments immediately after his divorce became final in May 2017. He used the $20,000 monthly advance to subsidize his monthly agreed upon alimony payments to his ex-wife. Between May 2017 and December 2018, these payments added up to roughly $380,000, which were purportedly added to the Defendant's loan balance owed to the Foreign Companies.

4. Miscellaneous "Loan" Requests

In addition to directing Zimmerman and Severin to provide funds to pay for his credit cards, taxes, and alimony, the Defendant regularly requested "loans" or "advances" in varying amounts. For example, on June 16, 2017, the Defendant directed Zimmerman and Severin to send HBH $25,000. He used those funds to make a downpayment on a new Tesla Model X valued at $175,000. Additionally, on November 2, 2017, the Defendant requested $30,000 "for a deal." He then used that money as a downpayment on a personal residence on Lake Minnetonka in Excelsior, Minnesota worth roughly $1.3 million.

Between on or about January 28, 2014, and October 17, 2018, the Defendant sent approximately 31 emailed requests to Severin and Zimmerman for ad hoc "loan" or "advance" payments. The amounts of these requests ranged from roughly $5,000 to $75,000—totaling nearly $867,000.

## C.    Falsifying HBH Records and Tax Returns

At the Defendant's direction, a large portion of the payments he received from the Foreign Companies during 2014 to 2018 were reported to the IRS as nontaxable loans—or, more specifically, as "other current liabilities" owed to Ijshuis, Firefly, and Rypl—for those years. These so-called liabilities drastically increased every year. For 2012, HBH's return reported no liabilities to the Foreign Companies. By 2018, however, that figure increased to nearly $5 million. The Defendant should have reported those payments as distributions received by HBH from the Foreign Companies, and he should have paid taxes on those distributions. Instead, for years, he filed false income tax returns grossly underreporting his true income and total taxes due.

To reach this fraudulent outcome, the Defendant first caused HBH's bookkeeper, Vicky Narveson ("Narveson"), to falsify HBH's books and records. Specifically, he instructed Narveson to code certain transactions as loans owed by HBH to the Foreign Companies in HBH's general ledger and year-end statements. Transfers from HBH to the Defendant were then coded as loans from HBH to the Defendant. Narveson always provided those financial statements to the Defendant for his approval. Narveson is expected to testify that she never asked

the Defendant why the loan balances only increased and that, in her estimation, she was hired to create the records that the Defendant wanted.

After HBH's annual financial statements were created, the next step in the Defendant's evasion scheme was the filing of false tax returns. From the early 2000s through the 2016 filing period, the Defendant retained Thomas O'Connell ("O'Connell"), a CPA and tax return preparer, to prepare his tax returns. O'Connell used the books prepared by Narveson—and approved by the Defendant—to compile the information necessary to prepare and file the Defendant's individual income tax returns and HBH's corporate tax returns.

The Defendant represented to O'Connell that the funds received beyond HBH's usual compensation from Firefly or Rypl were loans and that any subsequent transfers of such funds from HBH to the Defendant were also loans. Initially, O'Connell accepted these representations at face value. O'Connell was not retained to audit HBH, and he assumed that his client was providing him with truthful information.

For tax years 2014 and 2015, O'Connell prepared and filed (with the Defendant's authorization) the Defendant's individual and corporate federal income tax returns. For 2014, HBH reported owing $1,546,150 to Rypl and Firefly, and that, in turn, the Defendant owed $1,493,902 to HBH. For 2015, these figures grew to $2,306,644 and $2,398,302, respectively.

The next year, O'Connell grew concerned that the balance of the "loans" owed by HBH was only going up. He emailed the Defendant asking why there was

11

"[n]o interest charged or paid on loans [sic]." The Defendant did not respond.
O'Connell emailed the Defendant three more times, finally telling the Defendant
that the Defendant needed to provide or prepare a loan agreement with the
Foreign Companies. O'Connell warned the Defendant that "[t]he risk with your
loan is that the IRS comes in and claims it is compensation rather than a loan."
The Defendant largely ignored these requests. He never provided O'Connell with
documentation corroborating the claim that there was a bona fide loan agreement
between HBH and the Foreign Companies. The Defendant maintained that the
loans were legitimate despite not providing any corroborating documents.

Ultimately, O'Connell deferred to his longtime client, whom he knew was a
fellow CPA, with one caveat. Namely, the Defendant agreed to follow O'Connell's
recommendation that the Defendant report imputed interest[5] on his 2016 tax
filings and amend his prior individual tax returns for 2014 and 2015 to reflect this
this additional interest "income."

Following the 2016 filing season, the Defendant and O'Connell agreed to
part ways. In September 2018, the Defendant retained Justin Sundberg
("Sundberg"), another Minneapolis-based CPA and tax return preparer, to
prepare his 2017 and 2018 individual and corporate income tax returns. The

---

[5] Imputed interest is interest that the IRS assumes was charged on a loan, even if no
interest or below-market interest was actually charged. *See* 26 U.S.C. § 7872. In the case
of shareholder loans, the imputed interest is deemed paid by the shareholder to the
corporation, which the corporation must recognize as income. *See id.* § 7872(c)(1)(C).

Defendant formally notified O'Connell that he had engaged "local experts" and would no longer need his services.

Sundberg immediately noticed something was off with HBH's finances—particularly, the loans. He wrote the Defendant, "I'm not comfortable with the accounting here, which is normal (the small business world of loans here and there drives me nuts)[.]" In response, the Defendant threatened to fire Sundberg if Sundberg would not prepare and file the returns like the prior years, as the Defendant instructed. Specifically, he wrote, "If you can't do it. No problem. I can make other arrangements. And I don't understand what you mean by 'uncomfortable'. I've had advice from many top people for years regarding my structure and they all sign off." This was untrue. O'Connell, the Defendant's return preparer for the previous fifteen years, had questioned these payments and asked for corroborating documents, which the Defendant did not provide.

Sundberg backtracked, stating, "No it's not you or whatever – it's good. It's not real 'discomfort,' I just don't like doing loans for everything, but it's how it is in the entire world." Later, Sundberg wrote, "[s]ince you've had it analyzed and have been using it for years, I assume it's fine." The Defendant responded, "I'm not comfortable with this sort of judgment. Period."

Despite trying to get more information from the Defendant about these purported debts, Sundberg never saw any loan agreements or promissory notes and relied on the Defendant, who told him that the money would be repaid. And, like O'Connell, Sundberg took the Defendant at his word and reported the

payments as loans on the Defendant's 2017 and 2018 individual and corporate tax returns. By the end of 2018, HBH reported owing a loan balance to the Foreign Companies totaling over $4.9 million, and that, in turn, the Defendant owed HBH over $5.7 million.

### D.    Foreign Companies' Year-End Financial Reporting

Tellingly, the Foreign Companies' year-end financial reports and/or tax returns did *not* report outstanding liabilities owed from HBH consistent with the federal tax returns filed by the Defendant. For example, on HBH's 2014 federal income tax return, the Defendant reported that HBH owed $730,444 to Rypl. However, this amount does not appear on Rypl's Canadian income tax return, which in fact reported $0 in amounts due from its shareholders or directors for that year. Additionally, on HBH's 2017 federal income tax return, the Defendant reported that HBH owed $815,806 to Firefly and $730,444 to Rypl. These amounts do not appear on either Firefly's annual report—which reported $430,790 due from HBH—or Rypl's Canadian tax return—which reported only $320,621 in amounts due from its shareholders or directors.

### E.    Representations & Evasiveness During Divorce Proceedings

On February 23, 2016, Chantel Erickson ("Ms. Erickson"), the Defendant's then-wife, filed for divorce. As part of those proceedings, on April 30, 2016, the Defendant filed a Sworn Statement of Assets, Liabilities, and Income. On this form, the Defendant claimed to owe $1.8 million to HBH. He did not, however, provide a value for his 100% ownership of HBH, writing only "TBD." Likewise,

though he listed as assets his business interests in Ijshuis, Bannister, Firefly, Surecom, and Surecom, he left the "value" boxes next to each business's name blank.

The value of the Defendant's offshore holdings became a significant issue in determining the value of the couple's marital estate. Eventually, the court appointed Steve Dennis ("Dennis") of the accounting firm Abdo, Eick & Meyers LLP to act as a neutral evaluator of the value of the Defendant's businesses, including his stake in HBH and the Foreign Companies. On February 12, 2017, Dennis sent a list of nine requests for information to counsel for the Defendant and Ms. Erickson. Among other things, Dennis requested information regarding HBH's reported loans to the Defendant; in particular, Dennis wondered "why has the growth been so explosive (over $900,000 between 2014 and 2015), much greater than the $20,000 per month indicated in our interview?" Dennis also sought information about Firefly and Rypl, including financial statements, balance sheets, and documentation related to shareholder compensation.

The Defendant refused to turn over any meaningful information to Dennis. Before he could be compelled to do so, however, the Defendant and Ms. Erickson agreed to a settlement outside the presence of their attorneys. They drafted a joint letter response to Dennis' initial requests for information. In response to Dennis' question about the "explosive" growth in the purported loans to the Defendant from HBH, the letter claimed that "[t]he majority is home improvements. The

balance is personal spending (approx. $20k/mo). It is not related to the business evaluation."

On May 1, 2017, the court entered a divorce judgment based on the parties' stipulated findings of fact. The Defendant agreed to pay Ms. Erickson $24,960 in monthly alimony for ten years. He retained all rights to his ownership of HBH and the Foreign Companies and avoided having to make any meaningful disclosures about his offshore assets, any compensation agreements with the Foreign Companies, or the basis for the debt he claimed to owe HBH or the debt HBH claimed to owe the Foreign Companies.

## F.    Inconsistent Representations to Third-Party Banks

During his divorce, the Defendant moved out of his family's home and began renting a lakefront property in Excelsior, Minnesota. In 2017, he decided to purchase the property. To finance this purchase, the Defendant applied for a mortgage from Equity Bank (later known as American Equity Bank). On November 1, 2017, as part of his mortgage application, the Defendant signed a personal financial statement ("PFS"), which purported to list all of his current assets and liabilities. On that form, the Defendant claimed that HBH was worth $8,000,000. Tellingly, he did not report any debts owed to HBH—despite having filed HBH's tax return, which reported over $3.43 million in loans to its sole shareholder, the Defendant, just one month prior.

In 2019, the Defendant refinanced this mortgage. As part of this process, the Defendant submitted a Uniform Residential Loan Application ("URLA")

16

where he was again required to list his assets and liabilities. Here, he reported a monthly salary of $119,930.58 ($1,439,166.96 per year). This amount is significantly higher than what he reported to the IRS. At the time, his most recently filed individual income tax return, for tax year 2017, reported total income of $569,397. A few months later, he filed a 2018 tax return reporting $903,504 in total income earned that year. To date, he has never filed a 2019 tax return.

The Defendant did not report the value of his share in HBH, nor any liabilities owed to HBH, on the URLA. Again, this contradicted his most recent 2017 filings. HBH's corporate federal income tax return for 2017 reported that the Defendant owed the company approximately $4.5 million. HBH later reported that, at the end of 2018, the Defendant owed the company over $5.7 million. In addition to the URLA, the Defendant signed multiple forms certifying, among other things, that he had reported "all of [his] debts and material financial obligations" and his understanding that it is a federal crime "to make any false statement regarding income, assets, [or] debt."

Separate from his home purchase and refinancing, the Defendant also used funds from the Foreign Companies to purchase a new Tesla Model X valued at approximately $173,000. The flow of funds to make a down payment for this purchase is as follows. On June 12, 2017, the Defendant directed Zimmerman to send HBH $25,000 as a "loan." HBH received the funds that same day. Four days later, the Defendant completed a credit application with TD Auto Finance,

certifying that he was "applying for individual credit in [his] own name and [was] relying on [his] own income or assets and not the income or assets of another person." Finally, on June 19, 2017, the Defendant sent Tesla Motors a downpayment of $26,101.76 from HBH's bank account.

The contradictory representations that the Defendant made to the IRS, in his divorce proceedings, and in his applications for home and auto financing show a clear pattern: when the Defendant needed to downplay his financial condition, to avoid taxes or to understate his martial assets, he feigned indebtedness to HBH and the Foreign Companies. But when it came time to appear creditworthy to purchase a luxury home or vehicle, these so-called loans were suddenly nonexistent.

### G.    False Statements to IRS-CI

On August 28, 2019, two special agents from IRS-Criminal Investigation ("IRS-CI"), Rusty Kiser and Shauna Turner, visited the Defendant at his residence in Excelsior. They introduced themselves, showed the Defendant their credentials, and explained that they wanted to ask the Defendant questions about his tax returns. The Defendant agreed to speak with the agents and led them to his back patio. The interview was not audio or video recorded. However, IRS-CI Special Agent Turner took contemporaneous notes (the "Agent Notes"), including of the Defendant's statements. She also signed off on a Memorandum of Interview ("MOI") based on the Agent Notes, as well as her and Special Agent Kiser's recollections of the interview.

The interview lasted approximately two hours. After the Defendant walked the special agents through his professional background and general information about the Foreign Companies, he was asked about whether he received any dividends from his investments. According to the MOI and Agent Notes, he responded that he assumed so, but also was quoted as saying "I don't cut a pie before it's baked." The MOI and Agent Notes further describe that the Defendant acknowledged that he received loans from Firefly that continued to increase, which he explained was because the company had not yet established a dividend policy. He blamed his divorce for the lack of a dividend policy, but said that the plan was to eventually repay the loans with future dividends.

The Defendant next explained that after O'Connell retired, he retained Clifton Larsen Allen LLP ("CLA") and Sundberg to provide bookkeeping and tax services. The Defendant told the Special Agents, falsely, that both CLA and Sundberg had approved the way he reported his loans. This was untrue. As discussed above, Sundberg had challenged the Defendant's treatment of these payments and only retreated when the Defendant threatened to fire him. Further, Kyle Dawley ("Dawley"), the Principal at CLA in charge of the Defendant's account, has no recollection of ever being asked to advise on whether the Defendant's treatment of these "loans" was proper.

The Defendant then made one of two false statements charged in Count 16. This statement arose during a discussion of Rypl and Firefly's bank accounts. The Defendant explained that he was not a controlling shareholder in any company or

a signer on any of the Foreign Companies' bank accounts. Then, both the MOI and Agent Notes quote the Defendant as saying that he "never ever" directed to someone where to send money from Rypl or Firefly. There is simply no way to interpret this statement in a way that makes it true. The Defendant sent *dozens* of emailed directives to Zimmerman and Severin between 2014 and 2018 to send funds to HBH accounts. Beyond this, the Government's previously deposed witnesses—namely, Chad Moldon, Rypl's CEO ("Moldon"); Severin; and Zimmerman—all testified that the Defendant was the person that Rypl and Firefly employees and shareholders relied on to manage the day-to-day financial affairs of Rypl and Firefly.

Following this false statement, the Defendant is also quoted in both the MOI and the Agent Notes that it is "company discretion, not mine" as to the amount of his loans and the companies they came from. This also was a lie. The Defendant regularly and repeatedly emailed Zimmerman and/or Severin directing that they send him money. Zimmerman and Severin both testified in their depositions that they needed no other approval to send the funds beyond the Defendant's instructions. There was no shareholder vote, loan agreement, or interest rate set when the Defendant requested the money, or any attempts at repayment under *after* he was indicted in 2024—that is, *over three years* after he learned of IRS-CI's investigation.

## ANTICIPATED LEGAL AND EVIDENTIARY ISSUES

### A.    Motions in Limine

The Parties filed their initial round of motions in limine on March 7, 2025, pursuant to a now-amended scheduling order. The Government then filed the following motions in limine, which remain pending:

- Motion in Limine for Order Finding Tolling Orders Proper & Applicable to Indicted Charges (Docs. 67 (Motion), 100 (Response), 106 (Reply))

- Motion in Limine to Allow Summary Testimony of IRS Revenue Agent David Hewell (Docs. 74 (Motion), 99 (Response), (104 (Reply))

- Motion in Limine to Sequester Witnesses (Docs. 75 (Motion), 98 (Response), 105 (Reply))

- Motion in Limine to Limit Defense Expert Testimony (Docs. 76 (Motion), 97 (Response), 103 (Reply))

- Motion in Limine to Preclude Improper Arguments (Doc. 77)[6]

- Motion in Limine for Ruling Regarding Advice-of-Counsel Defense and Waiver of Attorney Client Privilege (Docs. 78 (Motion), 96 (Response), 102 (Reply))

Concurrent with this Trial Brief, the Government is also filing the following two motions in limine. These motions are made in response to the Defendant's initial disclosure of his proposed exhibit and witness lists on July 7, 2025.

- Motion in Limine to Exclude Reference to Rule 12 Arguments and Pole Camera Footage (Exs. D-192 and D-193) (Doc. 149)

- Motion in Limine to Exclude Testimony of Ann Seehoff and Ron Braver (Doc. 150)

---

[6] The Defendant did not file a response to this Motion in Limine. The Court should thus consider it unopposed.

The Government largely rests on the points and authorities set forth in these filings. Additionally, the Government writes as follows to provide additional context regarding the Motion in Limine for Ruling Regarding Advice-of-Counsel Defense and Waiver of Attorney Client Privilege (Doc. 76).

In that Motion, the Government respectfully seeks an order making three rulings: (1) that the Defendant be precluded from introducing evidence regarding an advice-of-counsel defense unless certain legal requirements are met; (2) that the Defendant provide the Government with advance notice of any such defense; and (3) making clear that any assertion by the Defendant regarding his good faith reliance on the advice of any attorney, or otherwise placing any attorney-client relationship directly at issue during trial, would waive his attorney-client privilege with respect to that attorney as to the relevant subject matter.

As a basis for this request, the Government described how the Defendant maintained personal and business relationships with attorneys during the years under prosecution, including with an individual named Paul Eidsness ("Eidsness"). Doc. 78 at 7. Eidsness is one of the Defendant's oldest friends and has also provided legal services for, and is a minor shareholder of, Firefly. Accordingly, the Government suspected that the Defendant may place his relationship with Eidsness at issue for trial, and thus, requested that the Court direct that pretrial notice and disclosure of pertinent documents, which implicate

22

attorney-client relationships, be provided as a matter of fairness and sound trial management. *See id.* at 7–8; Doc. 102 at 5–7.

The Defendant has already placed his communications with Eidsness at issue. During the depositions, defense counsel cross-examined Severin and Moldon at length about a post-indictment agreement dated March 28, 2024, that purportedly resulted in Firefly buying the Defendant out of the company (the "Buyout Agreement"). This examination included lines of questioning regarding Eidsness's role in negotiating and drafting that agreement, among other things. Shortly before the depositions, defense counsel also provided the Government with five exhibits (Exs. D-3, D-40, D-46, D-47, & D-54), which consisted of email communications involving Eidsness that the Government had not seen before (the "Eidsness Exhibits"). Defense counsel used these exhibits during cross-examination.

On May 27, 2025, the Government informed defense counsel via email that their use of these exhibits directly placed the Defendant's relationship with Eidsness at issue for trial. The Government further stated its position that, in so doing, the Defendant waived attorney-client privilege regarding Eidsness as to subject matter of those email exhibits. The Eidsness Exhibits concern the following matters: (1) loans, advances, and other payments to Firefly, Rypl, Surecom shareholders; (2) Firefly's banking practices; (3) accounting matters of Firefly and Surecom; and (4) corporate resolutions.

Accordingly, the Government requested that defense counsel search for and disclose all communications involving Eidsness and the above-listed subject matters in their possession—specifically directing defense counsel's attention to the fact that, in August 2024, the Government produced the entire universe of records obtained from an email search warrant on the Defendant's prior email account, including many materials that may contain potentially privileged attorney-client communications. To date, the Government has not viewed, nor had access to, those records.

The Defendant declined the Government's request. He claimed that the Eidsness Exhibits did not contain protected attorney-client communications, and thus, that disclosure did not constitute waiver. Even if those exhibits did not constitute *express* waiver, however, disclosure plainly constituted an *implicit* waiver. Voluntary disclosure of attorney client communications indeed expressly waives the privilege. *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) (cleaned up). But the privilege can also be implicitly waived, including "when a client places the attorney-client relationship directly at issue" or "asserts reliance on an attorney's advice as an element of a claim or defense." *See Zink v. Lombardi*, No. 2:12-CV-4209-NKL, 2013 WL 11762153, at *4 (W.D. Mo. June 18, 2013) (quoting *Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982)). This is exactly the case here.

Further, the issue remains ripe for the Court's review. On July 7, 2025, defense counsel provided the Defendant's proposed witness list, which includes

24

Eidsness. Specifically, the Defendant states that Eidsness "[w]ill testify to familiarity with defendant's businesses, the structure of his international businesses and the repayment of the defendant's loans through a buyout agreement with the companies involved."

Such proposed testimony may be inadmissible under Federal Rules of Evidence 401 or 403. Here, the probative value of the Buyout Agreement is minimal. As noted above, that document was executed in March 2024—years after the Defendant first learned he was under criminal investigation by the IRS in the late-summer of 2019, as well as roughly two months after the Defendant was indicted in this case for tax crimes. Courts have routinely found that remedial action in tax crime cases taken *after* a crime is complete is not relevant or admissible. *See, e.g.*, *United States v. Radtke*, 415 F.3d 826, 840 (8th Cir. 2005) (no abuse of discretion in excluding evidence that the defendant filed an amended tax return after being charged with willfully subscribing to a false tax return); *United States v. Davey*, 661 F. App'x 240, 245 (4th Cir. 2016) (finding no abuse of discretion in excluding defendant's tax return for a subsequent year in a case involving false characterization of loans for a prior year; "the relevant intent was Defendant's intent to repay—or not repay—the loan amount at the time he received it"); *United States v. Beavers*, 756 F.3d 1044, 1050 (7th Cir. 2014) (upholding preclusion of evidence concerning filing of amended tax returns and repayments to political campaign after learning of federal investigation); *United States v. Lanier*, 920 F.2d 887, 895 (11th Cir. 1991) (defendant's intention to repay

stolen money, and "even actual repayment," is not a defense to a charge under 18 U.S.C. § 641); *United States v. Scott*, 701 F.2d 1340 (11th Cir. 1983) (repayment irrelevant to the offense of intentionally providing false information to acquire loan accounts).

Additionally, the Defendant has already cross-examined employees, directors, and a shareholder of Firefly and Rypl who had knowledge of the Buyout Agreement. The Government also anticipates that the Parties will stipulate to the admissibility of the Buyout Agreement itself. There thus appears a great risk that eliciting further testimony from Eidsness about the Buyout Agreement would confuse or mislead the jury and be needlessly cumulative. The Government's ability to make such argument is limited, however, by the shroud of mystery regarding the full scope of Eidsness's anticipated testimony.

For these reasons, the Government repeats its request that the Court grant its motion in limine for an order regarding the sufficiency of any advice-of-counsel defense that the Defendant may claim, reasonable notice deadlines, and corresponding waiver of attorney-client privilege. If the Defendant plans to call Eidsness to testify about the negotiation of the Buyout Agreement as a representative of the Defendant, then he should choose between calling Eidsness as a trial witness and waiving the attorney-client privilege or not calling Eidsness as a witness. *See United States v. Beckman*, No. 11-CR-228, 2012 WL 1870247, at *2 (D. Minn. May 22, 2012).

**B.    Expected Stipulations**

The Parties have been met and conferred in an effort to streamline testimony for trial, and the Government hopes to enter into stipulations as to the authenticity and/or admissibility of various categories of evidence that will obviate the need to call certain custodians of records as witnesses at trial. While the parties are working through the details of these stipulations, the Government is hopeful that the Parties will be able to put these stipulations on the record at the pretrial conference and jointly move for the admission of any agreed exhibits.

The proposed stipulations under discussion concern five categories of evidence: (1) records obtained from the execution of an email search warrant; (2) domestic records of a regularly conducted activity; (3) public records, including tax returns; (4) certifications of the non-existence of public records; and (5) foreign records of regularly conducted activity. Absent stipulations, the Government intends to introduce these records as described below.

1. <u>Defendant's Email Communications Obtained via Search Warrant</u>

The Government intends to introduce evidence obtained during the execution of electronic search warrant on the Defendant's email account, including emails sent to and from the Defendant and other records attached to those communications. The materials produced by an internet service provider, IVDesk, in response to the search warrant were processed by IRS-CI Special Agent and Computer Investigative Specialist Nate Price.

27

In the absence of stipulations regarding these materials, the Government intends to call Special Agent Price as a trial witness to testify regarding his role in downloading, processing, storing, and/or maintaining electronic data produced by IVDesk related to the Defendant's email account. Should he be required to testify at trial, he would also establish that the emails and digital files comprising the Government's discovery productions of warrant materials, and corresponding trial exhibits, were located in the Defendant's email account or subject to logical extractions in connection with the authorized warrant.

2. Domestic Records of a Regularly Conducted Activity (Business Records)

The Government also intends to offer various regularly kept documents from banks and other third-party entities. With respect to any such business records for which the Defendant is unwilling to stipulate with respect to foundation, the Government has and will be providing notice to defense counsel of its intent to offer these business records pursuant to the self-authentication provisions of Federal Rules of Evidence 803(6) and 902(11). The records have been identified with particularity to the defense in the Government's proposed Exhibit List, and certifications for these records have all been produced to the Defendant.

3. Public Records and Tax Returns

Absent a stipulation, the Government will also seek to admit certain public records, including tax returns and other IRS records, pursuant to the self-authentication provisions of Federal Rules of Evidence 803(8) and 902(1), (2), and

(4).[7] IRS records are admissible as public records under Federal Rule of Evidence 803(8). *See*, *e.g.*, *United States v. Fletcher*, 322 F.3d 508, 518 (8th Cir. 2003) (IRS assessments or liens admissible as public record); *United States v. Stefani*, 338 F. App'x 579, 581 (9th Cir. 2009) (tax returns admissible under 803(8)); *United States v. Childress*, 24 F. App'x. 139, 142 (4th Cir. 2001) ("[O]fficial IRS documents, even if generated by a computer, are admissible as public records[.]"); *United States v. Jones*, 958 F.2d 520, 521 (2d Cir. 1992) (IRS transcript admissible as public record).

4. <u>Non-Existence of a Public Record</u>

Absent a stipulation, and pursuant to Federal Rule of Evidence 803(10), the Government anticipates introducing certifications from the IRS explaining that record custodians or other qualified individuals conducted diligent searches for federal tax returns filed by the Defendant or HBH for tax years 2019 to 2022 and 2024 and that they were unable to locate any records.

5. <u>Foreign Records of a Regularly Conducted Activity (Foreign Business Records)</u>

During its investigation, the Government obtained a large amount of foreign business records through Mutual Legal Assistance Treaties ("MLATs") with various foreign countries. The Government intends to introduce various

---

[7] Even if the Parties stipulate to the authenticity and admissibility of the relevant IRS records, the Government intends to introduce testimony through IRS employee Roman Hernandez, known as a "Court Witness Coordinator," who will generally describe IRS procedures and records.

documents obtained via MLAT relating to the Foreign Companies, including foreign tax returns, financial reports, incorporation records, and bank records, pursuant to the self-authentication provisions set forth in 18 U.S.C. § 3505(a)(1) and Federal Rule of Evidence 902(12).

Under 18 U.S.C. § 3505(a)(1), such records shall not be excluded evidence if a foreign certification attests that—

(A)    such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(B)    such record was kept in the course of a regularly conducted business activity;

(C)    the business activity made such a record as a regular practice; and

(D)    if such record is not the original, such record is a duplicate of the original.

The Government provided notice to the Defendant of its intent to introduce this evidence pursuant to 18 U.S.C. § 3505(b) in various discovery letters dated February 11, 2025, March 20, 2025, and April 11, 2025. To date, defense counsel have raised no dispute regarding the authenticity of these records. The records have further been identified with particularity to the defense in the Government's proposed Exhibit List, and certifications for these records have all been produced to the Defendant.

## C.  Defendant's Statements; Out-of-Court Inadmissible Hearsay Statements

The Government intends to introduce numerous non-hearsay statements of the Defendant as offered against an opposing party, pursuant to Federal Rule of Evidence 801(d)(2)(A). These statements will include both written and verbal statements made by the Defendant to his subordinates employed by Rypl, minority shareholders of Firefly, various lay witnesses, the IRS, and others.

The bulk of these statements that the Government anticipates introducing into evidence will involve hundreds of email chains involving the Defendant and, among other things, his various requests that the Foreign Companies send him money. To the extent that the emails are written by the Defendant, they will be offered as statements of a party opponent. To the extent that those email chains also include statements of others, the Government submits those statements will be introduced for a non-hearsay purpose, that is, to show the effect on the listener and the Defendant's knowledge, intent, and involvement in the transactions at issue.

In contrast, a defendant is not permitted to admit his own self-serving out-of-court statements because Rule 801(d)(2)(A) only applies to statements offered against a party-opponent. Thus, it is improper for defense counsel to either elicit or introduce into evidence a defendant's out-of-court statements. *See, e.g.*, *United States v. Mitchell*, 502 F.3d 931, 964–65 (9th Cir. 2007) (defendant could not on cross-examination of case agent elicit exculpatory statements made by defendant

during interviews with case agent); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (defendant did not have right to introduce redacted portions of his out-of-court statement into evidence because it was hearsay and "not needed, in fairness, to make complete the portions of his statement that were admitted against him.").

### D.    Summary/Expert Testimony

As explained in other filings (*see* Docs. 74, 101, & 104), to assist the jury in the examination of the numerous bank accounts, to calculate unreported receipts, and to compute additional tax due and owing, the Government will call IRS Revenue Agent David Hewell as a summary expert witness. Revenue Agent Hewell's anticipated testimony will include summarizing the Defendant's banking activity, payment requests from the Foreign Companies, IRS records, and other records, as well as computing the Defendant's unreported income and additional tax due. This testimony will predominately concern Revenue Agent Hewell's summary analysis of the transactions, which necessarily stems from the testimony of other witnesses and admitted documentary evidence.

Additionally, Revenue Agent Hewell will opine that the Defendant's tax returns falsely characterized millions of dollars that he received from the Foreign Companies, directly and indirectly, as nontaxable loans. The Government disclosed Revenue Agent as an expert on January 20, 2025. (Doc. 52). An expert's opinion on an ultimate issue in a case—such as Revenue Agent Hewell's conclusion that the Defendant's tax returns falsely report certain payments from

the Foreign Companies as purported loans, as opposed to taxable distributions, and thus that the Defendant's resulting income and tax due were falsely underreported—is not objectionable, assuming the expert does not opine on the defendant's mental state. *See* Fed. R. Evid. 704. Revenue Agent Hewell's testimony will comply with Rules 702 and 704.

### E.    Admissibility of Summary Exhibits

Because this case involves such voluminous documentary evidence, the Government intends to offer summary charts prepared by Revenue Agent Hewell into evidence to assist the jury. Summary charts are properly admitted when (1) the charts fairly summarize voluminous trial evidence, (2) they assist the jury in understanding testimony already introduced, and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summaries. *United States v. Spires*, 628 F.3d 1049, 1052–53 (8th Cir. 2011) (citing Fed. R. Evid. 1006); *see also United States v. Boesen*, 541 F.3d 838, 848 (8th Cir. 2008) (holding charts summarizing clinic's revenue stream were properly admitted into evidence in health care fraud trial). "Also, summaries may include assumptions and conclusions so long as they are 'based upon evidence in the record.'" *Spires*, 628 F.3d at 1053 (citation omitted).

Revenue Agent Hewell's tax loss computations and related summaries were provided to the Defendant as drafts on July 14, 2025. These materials include summaries of voluminous bank records, business records of HBH and the Foreign Companies, email communications sent by the Defendant, and IRS records,

among other materials.[8] The Government plans to provide updated versions and/or additional Rule 1006 summaries to the Defendant before the trial and requests the Court to order the defendant to do the same, if applicable.

## **CONCLUSION**

The foregoing is a summary of the issues the Government anticipates will arise at trial. The Government reserves its right to raise additional evidentiary objections at trial as the evidence develops or in response to any future pretrial filings by the Defendant.

Dated: July 14, 2025                    Respectfully Submitted,

JOSEPH H. THOMPSON
Acting United States Attorney

*/s/ Amanda R. Scott*
BY:    AMANDA R. SCOTT
Wisconsin State Bar No. 1115668

*/s/ Boris Bourget*
BORIS BOURGET
Maryland State Bar. No. 2109080015

Trial Attorneys
Department of Justice, Tax Division
150 M Street NE
Washington, DC 20002
(202) 718-2056 (Scott)
(202) 307-2182 (Bourget)
*Attorneys for the United States*

---

[8] Though the records underlying Rule 1006 summaries need not be admitted into evidence, the Government intends to introduce the records underlying Revenue Agent Hewell's summary exhibits pursuant to stipulations, as self-authenticating records, or through the testimony of a qualified custodian.